23CA2200 Spirit v ICAO 10-03-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA2200
Industrial Claim Appeals Office of the State of Colorado
WC No. 5-131-365

---

Spirit Hospitality II LLC, d/b/a Candlewood LLC and Truck Insurance Exchange,

Petitioners,

v.

Industrial Claim Appeals Office of the State of Colorado and Juliana Luis,

Respondents.

---

ORDER AFFIRMED

Division V
Opinion by JUDGE LUM
Brown and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 3, 2024

---

Law Offices of Collin T. Welch, Joe M. Espinosa, Oklahoma City, Oklahoma, for Petitioners

No Appearance for Respondent Industrial Claim Appeals Office

Cerda Legal, Adan Cerda, Gregory Cairns, Denver, Colorado, for Respondent Juliana Luis

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Spirit Hospitality II LLC, d/b/a Candlewood LLC and Truck Insurance Exchange (petitioners) appeal an order of the Industrial Claim Appeals Office (the Panel) affirming the finding of an administrative law judge (ALJ) that claimant Juliana Luis had not reached maximum medical improvement (MMI) for a compensable injury.  We affirm.

## I.    Background

¶ 2    Luis sustained an admitted work injury in 2019 related to her right upper arm.  She was placed on modified duty in her job as a housekeeper for Candlewood Suites.  Luis is relatively short in stature, noted in medical records to stand at four feet, eight inches tall.  On February 15, 2020, Luis was at work, cleaning a hotel room, when she stood on a chair in order to reach the top of a microwave oven.  While stepping onto the chair with her left foot, the chair moved from under her, causing her to fall to the ground.  She fell onto her left side, landing on her left hip and knee.  The medical records indicate that she twisted her back during the fall, and the chair fell on top of her.

¶ 3    Luis was seen the same day by Sheree Montoya, a nurse practitioner at Concentra Fort Collins.  Luis reported burning pain

radiating to the left buttocks, causing decreased mobility in rotating and bending the spine. Two days later, Luis visited Dr. Jeffrey Baker at Concentra, reporting pain in the left hip, leg, and lower back as well as "some radiation of pain to her knee." Dr. Baker diagnosed sacroiliac strain and referred Luis to a physical therapist at Concentra, Nicholas Wright, who saw her the same day. She visited Dr. Baker again on February 25, reporting both back and left knee pain. Dr. Baker diagnosed her with a continued sacroiliac strain as well as a contusion to her left knee.

¶ 4 Luis continued to work in a modified position through the end of March 2020, but then she was laid off due to the COVID-19 pandemic. On April 22, 2020, Luis visited Steven Toth, P.A., who noted that she complained of right leg pain when walking. She stated that the pain was there originally on the date of injury but she did not report it.

¶ 5 She continued treatment for her work injury with Dr. Baker, DPT Wright, and a chiropractor, Dr. Parker. She had an MRI of her lumbar spine and pelvis in August 2020.

¶ 6 Luis was referred to Dr. Gregory Reichhardt on October 5, 2020, as an authorized treating physician (ATP) for evaluation of

her injury. Dr. Reichhardt noted that Luis reported pain in the low back, radiating pain down to the foot, weakness in the left leg, and left knee pain. Dr. Reichhardt also documented in his records that Luis complained of bilateral lower extremity pain and weakness.

¶ 7    Dr. Reichhardt's examination confirmed right arm pain and left leg pain. He documented that her August MRI reflected disc bulges and degeneration as well as foraminal stenosis. He specifically attributed her back and knee pain to the February 15, 2020, work injury, and her right arm pain to the August 25, 2019, work injury. He reported that Luis complained of right ankle pain related to the injury that wasn't included in her workers' compensation claim. Luis informed him that her employer didn't list the ankle pain initially and providers indicated they couldn't treat the pain because it wasn't listed. He recommended an MRI of her left knee and an electrodiagnostic evaluation (EMG) for her left lower extremity.

¶ 8    Luis followed up with Dr. Baker, who documented that she had continued back pain and left knee tenderness and pain. He ordered an MRI on her left knee, which was done in December 2020.

¶ 9     On December 11, 2020, Luis returned to see Dr. Reichhardt, who noted that she was having weakness in the right leg, which she thought was related to dry needling.  Luis had complained that a nerve was hit, and one day after her second dry needling treatment, she had difficulty coordinating her right leg, which then got worse after her last chiropractic treatment.

¶ 10    Dr. Reichhardt saw Luis again in January and February of 2021.  Luis reported pain and weakness in both legs and inability to walk without a cane.  At some point, Dr. Reichhardt was erroneously informed by P.A. Toth that Luis had not reported her knee injury until ten days after the injury.  Dr. Reichhardt's notes from the February 2021 visit state that, after talking with P.A. Toth, "it appeared that her knee pain was probably not related to her injury."  His notes indicated he discussed this with Luis, who said she did not have any problems with her knee prior to her injury, and she felt it was related to her injury.

¶ 11    At petitioners' request, Dr. Douglas Scott performed an Independent Medical Exam (IME) on February 23, 2021.  Dr. Scott opined that the mechanism of injury occurred without significant force due to Luis's short height, and that Luis reached MMI on June

3, 2020. Luis continued treatment with Dr. Reichhardt, who performed an EMG and recommended injections and massage therapy. At a visit on July 20, 2021, Dr. Reichhardt put Luis at MMI. His impressions indicated that Luis had pain and weakness in the low back and left lower extremity, both of which he related to the February 15, 2020, injury. Dr. Reichhardt assigned impairment ratings both for the back and left knee.

¶ 12    Petitioners then requested a division independent medical examination (DIME). On August 10, 2022, the DIME physician, Dr. Sander Orent, concluded that Luis was not at MMI. After examining Luis, he documented that she had constant low back pain that radiated down both legs. She also had trouble raising her left leg, had pain with swelling in both knees, and had swelling and restricted range of motion in the right ankle. He diagnosed her with lumbar strain and bilateral knee contusions, with the left knee injury occurring at the time of her work injury. He also diagnosed her with a right ankle sprain, noting that the "mechanism of injury is certainly consistent, there have been no intervening events[,] and I do believe this patient's history." Dr. Orent also opined that an injury to Luis's right knee was caused by chiropractic manipulation

5

she underwent as a result of her other injuries. He found Luis was not at MMI because she required a repeat MRI of the low back, medical findings relating to the left knee, and further care.

¶ 13 At petitioners' request, Dr. John Aschberger performed an IME in November 2022. He agreed with Dr. Reichhardt's assessment that Luis had attained MMI on July 20, 2021. Dr. Reichhardt examined Luis again in November 2022, after talking to Dr. Aschberger. Dr. Reichhardt recommended Luis be treated for cervical spine impingement and a clonus.[1]

¶ 14 In December 2022, Dr. Scott issued a supplemental report at petitioners' request. He reviewed further records and noted that his opinions had not changed; that Luis had reached MMI on June 3, 2020; and that Dr. Orent's impairment opinions were questionable.

¶ 15 Petitioners filed an application for hearing (AFH) in September 2022, checking the boxes for "medical benefits," "reasonably necessary," and "permanent partial disability benefits." Under "other issues," petitioners listed "Overcoming DIME, MMI, credits, offsets, intervening event, waiver." Luis filed a response to the AFH

---

[1] Dr. Aschberger described clonus as "repetitive contraction."

on issues including medical benefits, average weekly wage, temporary disability benefits, and, if Luis was found to be at MMI, permanent partial disability benefits and *Grover* medical benefits.

¶ 16    A hearing was held in January 2023.  Luis, Dr. Orent, Dr. Aschberger, and Dr. Scott all testified.  The ALJ issued findings of fact and conclusions of law, concluding that petitioners failed to prove by clear and convincing evidence that the DIME physician was incorrect, and therefore, Luis was not at MMI.  Petitioners filed a petition for review under section 8-43-301(5), C.R.S. 2024.  After briefing, the ALJ issued supplemental findings of fact and conclusions of law but didn't change her conclusion.  The ALJ ordered petitioners to pay for reasonably necessary medical care "related to the February 15, 2020[,] work injury" to "cure and relieve [Luis] of the compensable injury."  The ALJ also ordered petitioners to pay temporary total disability benefits as of July 20, 2021, and continuing until terminated by law.

¶ 17    Petitioners then appealed to the Panel, which affirmed.  This appeal followed.

## II.   Standard of Review and Legal Principles

¶ 18    Our review of the Panel's order is narrow.  *See Metro Moving &*
*Storage Co. v. Gussert*, 914 P.2d 411, 415 (Colo. App. 1995).  We
may set aside an order only upon the following grounds:

> [t]hat the findings of fact are not sufficient to
> permit appellate review; that conflicts in the
> evidence are not resolved in the record; that
> the findings of fact are not supported by the
> evidence; that the findings of fact do not
> support the order; or that the award or denial
> of benefits is not supported by applicable law.

§ 8-43-308, C.R.S. 2024.

¶ 19    We must accept the ALJ's findings of fact if they are supported
by substantial evidence.  *Id.*  Substantial evidence is "that quantum
of probative evidence which a rational fact-finder would accept as
adequate to support a conclusion, without regard to the existence of
conflicting evidence." *Metro Moving & Storage*, 914 P.2d at 414.  In
applying this test, "we must view the evidence as a whole and in the
light most favorable to the prevailing party."  *Id.*  We defer to the
ALJ's credibility determinations and resolution of conflicts in the
evidence, including conflicts in the medical evidence.  *Id.*  Causation
is generally a question of fact for the ALJ.  *Faulkner v. Indus. Claim*
*Appeals Off.*, 12 P.3d 844, 846 (Colo. App. 2000).

¶ 20    The exclusive remedy available to employees for workplace injuries in Colorado is the Workers' Compensation Act of Colorado (the Act), §§ 8-40-101 to -47-209, C.R.S. 2024.  To provide care to an injured employee under the Act, the employer or the employer's insurer identifies a list of providers from which the employee selects an ATP.  § 8-43-404 (5)(a)(I)(A), C.R.S. 2024.  Following this care, the ATP determines when the employee has reached MMI and the degree of any permanent impairment.  § 8-42-107(8)(b)(I), C.R.S. 2024.  If any party disputes the ATP's finding, the party may initiate the selection of an independent medical examiner to conduct a DIME.  *See* § 8-42-107.2(2)(a)(I), (b)-(c), C.R.S. 2024.  The DIME physician examines the claimant and makes an independent finding of the claimant's condition.  This finding may only be overcome by clear and convincing evidence.  § 8-42-107(8)(b)(III).

### III.   Analysis

¶ 21    In their opening brief, petitioners raise the following issues:

- Whether the Panel correctly held that Workers' Compensation Rule of Procedure 11-5, Div. of Workers' Comp. Rule 11-5, 7 Code Colo. Regs. 1101-3, (WCRP 11-5)

does not prevent the DIME physician from evaluating any and all body parts in determining MMI.

- Whether the ALJ correctly held that the DIME physician's opinion on MMI was not overcome by clear and convincing evidence.

- Whether the ALJ erred by not finding that Luis had an intervening event.

- Whether the ALJ erred by allowing undisclosed testimony by a non-retained expert.

We examine each contention in turn.

### A. WCRP 11-5 Did Not Limit the Scope of the DIME

¶ 22 Petitioners contend that Dr. Orent was not authorized to examine Luis's lower extremities because they only listed her back and psychological issues on their DIME application.[2]

---

[2] It's unclear whether petitioners take issue with the examination and inclusion of all lower extremities or just the right knee and right ankle. Their briefing generally refers to "lower extremities," but when asked about the left knee at oral argument, petitioners' counsel said that the left knee was omitted but "my client did not take issue with that." Because this distinction doesn't affect our analysis, we will refer generally to petitioners' objection to Dr. Orent's examination of Luis's "lower extremities."

¶ 23     Section 8-42-107.2(5)(a)(I) states that "[The Director of Workers' Compensation] shall promulgate rules consistent with this section (5) to determine the amount and allocation of costs to be paid by the parties for the independent medical examination." WCRP 11-5(A) provides a schedule for the fees a DIME physician may charge based on body parts and date of injury. Div. of Workers' Comp. Rule 11.5(A), 7 Code Colo. Regs. 1101-3. Petitioners rely on that rule to argue that the Director of Workers' Compensation must have meant to substantively limit DIME physicians by enacting a structured pay schedule based on the number of body parts and quantity of medical records. But the statute makes no mention of any substantive limitation on the examining physician's assessment of MMI based on the number of body parts selected on the DIME application, *see* § 8-42-107.2, and WCRP 11-5 is also silent on the matter. We cannot read language into the rule or statute, and we must give the plain language of the statute and rules their full effect. *See Smith v. Exec. Custom Homes, Inc.*, 230 P.3d 1186, 1191 (Colo. 2010) (court cannot give a statute a meaning that the plain language does not support).

11

¶ 24    In this case, petitioners argue that since they endorsed only the low back and psychological impairment on their DIME application, Dr. Orent erred when he went beyond those body parts to examine Luis's lower extremities. In other words, they argue that Dr. Orent, as the DIME physician, should have reviewed only what the petitioners wanted him to. The Panel rejected that argument, concluding that WCRP 11-5 uses the list of body regions to compute the DIME fee, and not to limit the scope of the DIME evaluation.

¶ 25    We agree with the Panel. Nothing in the applicable statute or WCRP 11-5 limits a DIME physician from addressing any and all relevant body parts. *See Peitz v. Indus. Claim Appeals Off.*, 2024 COA 102, ¶¶ 28-30; *see also Paint Connection Plus v. Indus. Claim Appeals Off.*, 240 P.3d 429, 433 (Colo. App. 2010) (MMI should be determined by considering the date on which all of the claimant's injuries from the accident have reached maximum recovery).

¶ 26    Relatedly, petitioners contend that, by not exercising her "right" to add body parts to the DIME, Luis waived the right to have those body parts addressed by Dr. Orent or the ALJ. We disagree.

¶ 27     Waiver is the intentional relinquishment of a known right. *Burlington N. R. Co. v. Stone Container Corp.*, 934 P.2d 902, 905 (Colo. App. 1997).

¶ 28     Under section 8-42-107.2(2)(b), "if any party disputes a finding or determination of the [ATP], such party shall request the selection of an IME." Here, Luis's ATP, Dr. Reichhardt, had determined her to be at MMI. Petitioners disputed the ATP's findings and requested a DIME. Therefore, they controlled the initial request for which body parts they wanted examined.[3]

¶ 29     While petitioners argue that Luis could have added the lower extremities to the DIME application if she wanted Dr. Orent to examine them, they don't cite any statutory or regulatory procedure expressly providing a mechanism for her to do so. At oral argument, petitioners suggested that Luis could have used WCRP 11-11. But that rule merely explains how the parties can address

---

[3] It's not clear whether Luis could have requested her own DIME at this point because petitioners hadn't entered a final admission of liability for the February 2020 injury. *See* § 8-42-107.2(2)(a)(I)(A), C.R.S. 2024 ("For the claimant, the time for selection of an IME commences with the date of mailing of a final admission of liability by the insurer or self-insured employer that includes an impairment rating issued in accordance with section 8-42-107.").

non-compliance with the rule. It doesn't provide any mechanism for the non-requesting party to add body parts to the DIME.

¶ 30 Even if there was some ad hoc procedure Luis could have used to request amendment of the application, petitioners cite no language suggesting that the court was required to grant the request. Likewise, petitioners cite no language suggesting that a claimant's failure to make such a request (1) precludes a DIME physician from examining or opining about non-selected body parts or (2) waives a claimant's ability to defend the DIME physician's findings before the ALJ. In sum, Luis had no clear right — and certainly no duty — to add body parts to the application at the time that petitioners requested the DIME.

¶ 31 For these reasons, we reject petitioners' arguments that WCRP 11 (or Luis's purported failure to attempt to amend the application) prevented Dr. Orent from opining about Luis's lower extremities or prevented the ALJ from considering those opinions.

### B. The DIME Physician's Determination

¶ 32 A DIME physician's MMI determination must be overcome by clear and convincing evidence. § 8-42-107(8)(b)(III). Clear and convincing evidence is evidence demonstrating that it is "highly

14

probable" that the DIME physician's rating is incorrect. *Metro Moving & Storage,* 914 P.2d at 414. Therefore, to overcome the DIME physician's opinion, the evidence must establish that it is incorrect. *Leming v. Indus. Claim Appeals Off.,* 62 P.3d 1015, 1019 (Colo. App. 2002). Such evidence must be unmistakable and free from serious or substantial doubt. *Id.*

¶ 33  We do not separately review each individual basis for an ALJ's credibility determination and resolution of conflicting evidence in isolation. Nor do we hold the ALJ to "a crystalline standard in articulating . . . findings of fact." *Magnetic Eng'g, Inc. v. Indus. Claim Appeals Off.,* 5 P.3d 385, 388 (Colo. App. 2000).

¶ 34  As the ALJ observed, Dr. Orent testified in detail, consistent with his report, about the reasons he concluded Luis wasn't at MMI. The ALJ's thorough findings of fact and conclusions of law reveal that the ALJ carefully considered the testimony of each witness and concluded that Dr. Orent was more credible than the other testifying physicians.

¶ 35  Specifically, the ALJ found that Dr. Scott's testimony in finding that Luis reached MMI on June 3, 2020 — when Dr. Parker said that Luis could perform a squat despite continuing

symptoms — was "simply not credible." The ALJ explained that Dr. Scott had relied heavily on Dr. Parker's "suspect" notations indicating Luis "transitioned from a seated to a standing position without difficulty, pain complaints, or pain behaviors" despite her reports of continued pain and symptoms.

¶ 36     As to Dr. Aschberger, the ALJ noted that he didn't disagree that Luis needed further evaluations but had simply concluded that "since the treatment provided did not resolve her complaints . . . they were probably unrelated to the work injury." Additionally, the ALJ credited Dr. Orent's testimony that Dr. Aschberger's and Dr. Scott's opinions were simply differences of opinion.

¶ 37     Finally, the ALJ concluded that Dr. Reichhardt's opinion was more persuasive than Dr. Scott or Dr. Aschberger, but it still didn't rise to the level of clear and convincing evidence because, among other things, Dr. Reichhardt relied on the erroneous communications from another provider that Luis hadn't complained of leg pain during the visits immediately after the injury.

¶ 38     We will not second-guess these credibility determinations, the ALJ's assessment of the persuasive value of the evidence, or the

resolution of conflicting evidence.[4]  *See Metro Moving & Storage*, 914 P.2d at 414-15.  We see no reason to disturb the ALJ's conclusion — or the Panel's decision upholding it — that Dr. Orent's report had not been overcome by clear and convincing evidence.

¶ 39    We next address and reject petitioners' arguments to the contrary.

¶ 40    As best we can discern, petitioners first argue that Dr. Orent made an error in applying the American Medical Association (AMA) Guides and Division's Impairment Rating Tips.  The Panel concluded, and we agree, that the AMA guides apply solely to the calculation of permanent impairment.  *See* § 8-42-101(3.7), C.R.S. 2024.  Similarly, the Panel concluded that because the Division Impairment Ratings Tips are interpretations of the AMA guides, they also have no bearing on whether a patient has reached MMI. Petitioners don't cite — and we haven't found — any authority to

---

[4] To the extent petitioners argue that the ALJ erred because Dr. Orent's findings about Luis's range of motion were "non-physiologic" or "not substantiated," we disagree.  It is the ALJ's sole prerogative to resolve conflicts in the medical evidence.  *See Metro Moving & Storage Co. v. Gussert*, 914 P.2d 411, 415 (Colo. App. 1995).

the contrary. Because the patient must be at MMI before a permanent impairment rating is assigned, *see Rosten v. Indus. Claim Appeals Off.*, 2023 COA 62, ¶ 23, we don't see how Dr. Orent's purported failure to apply the AMA guides or the Division Impairment Ratings Tips undermines the ALJ's finding that his opinion wasn't overcome by clear and convincing evidence.

¶ 41     Next, petitioners appear to argue that Dr. Orent's opinion was unpersuasive because he based his inclusion of the right ankle and right knee on Luis's reporting even though the medical records do not mention a right ankle injury occurring on the date of injury. But the ALJ found, with record support, that the medical records showed a pattern of Luis's complaints regarding her right lower extremity, with PA Toth noting her complaints of right leg pain as early as April 2020. Dr. Reichhardt also documented in his October 2020 report that Luis had bilateral lower extremity pain and weakness. Notably, both PA Toth and Dr. Reichhardt noted that Luis informed them that the right leg or ankle pain had been present on the date of the injury.

¶ 42     Finally, to the extent petitioners argue that Dr. Orent's testimony was overcome because (1) he didn't consider the

independent medical exams performed by two other professionals; (2) he didn't consider the DIME from Luis's 2019 workplace injury; and (3) he testified inconsistently with his report, we decline to address these arguments because they are undeveloped. *See Woodbridge Condo. Ass'n., Inc. v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12 (noting that this court doesn't "consider undeveloped and unsupported arguments").

¶ 43 Accordingly, we see no reason to set aside the Panel's decision.

## C. Intervening Event

¶ 44 Petitioners next contend that the ALJ erred by failing to find that Luis suffered an intervening injury. We disagree.

¶ 45 An intervening injury may sever the causal connection between the industrial injury and the claimant's condition. *See Standard Metals Corp. v. Ball*, 172 Colo. 510, 512, 474 P.2d 622, 623 (1970). It is petitioners' burden to prove that Luis's disability is attributable to the intervening injury or condition and not the industrial injury. *See Atlantic & Pacific Co. v. Barnes*, 666 P.2d 163, 165 (Colo. App. 1983) ("[A]s a general rule, the burden of proof rests upon the party who asserts the affirmative of an issue."). Whether petitioners have sustained their burden to prove Luis's disability

19

was triggered by an intervening event is a question of fact for resolution by the ALJ. *See City of Aurora v. Dortch*, 799 P.2d 462, 464 (Colo. App. 1990).

¶ 46 Petitioners contend Luis must have injured herself during an emergency trip to Mexico, thus severing the causal connection between the injury and her condition. As best we can discern, this is based on evidence that (1) Luis reported in November 2022 that she had fallen "15-20" times over the preceding year and (2) Luis began walking with a cane sometime after her Mexico trip.

¶ 47 During the hearing, Luis testified that in November 2021 she traveled to Mexico for approximately one month for an emergency, but she didn't testify about any injury that happened there. The ALJ noted that "there was no confirmation or credible evidence that [Luis] suffered any accident or incident while she was in Mexico," and petitioners don't cite to any in the record.

¶ 48 For these reasons, we are not persuaded that the ALJ erred when she found "insufficient evidence to determine that it is more probable than not that [Luis]suffered an intervening event."

## D.     Undisclosed Testimony

¶ 49     Finally, petitioners contend that the ALJ erroneously allowed Dr. Orent to answer a hypothetical question about Luis's clonus condition because the opinion expressed in his answer wasn't disclosed before trial.

¶ 50     During his testimony, Dr. Aschberger opined that Luis may have suffered from a clonus condition that contributed to some of her complaints and symptoms related to her lower extremities. He also opined that the clonus was not caused by the workplace injury.

¶ 51     Dr. Orent testified after Dr. Aschberger. On direct examination, he opined, "I don't know why she has this clonus. I am as disturbed . . . as Dr. Aschberger is, but I am not so quick to say that it is not related to her occupational injury." Counsel then asked, "Doctor, hypothetically, if you were to find out that the claimant fell prior to an evaluation and, in [falling], had hit her head, might that explain a clonus finding from Dr. Aschberger?" Petitioners objected on the grounds that any opinion about the hypothetical was undisclosed. The court overruled the objection because "the door was opened by how Dr. Aschberger testified." Dr. Orent then opined that "a clonus is an upper neuron disease," and

"a fall that injured the neck and/or head is certainly possible as a cause for these upper motor neuron findings."

¶ 52    Assuming, without deciding, that the ALJ erred by admitting the testimony, petitioners don't explain — and we can't discern — how the error prejudiced them. As best we can tell, Dr. Orent didn't rely on the clonus when opining that Luis wasn't at MMI. And we don't see that the ALJ relied on the disputed testimony when it concluded that (1) the DIME wasn't overcome by clear and convincing evidence and (2) petitioners didn't prove that Luis suffered an intervening fall that was unrelated to the workplace injury. Accordingly, we perceive no reversible error. *See* C.A.R. 35(c) (appellate court may disregard any error or defect not affecting the substantial rights of the parties); *Cherry Creek Sch. Dist. No. 5 v. Voelker*, 859 P.2d 805, 812 (Colo. 1993) (noting that a party's substantial rights are affected "where it can be said with fair assurance that the error influenced the outcome of the case or impaired the basic fairness of the trial itself.").

## IV.    Disposition

¶ 53    The Panel's order is affirmed.

JUDGE BROWN and JUDGE BERGER concur.

22